FILED
2022 Apr-08  PM 04:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **BARBARA SMITH,** )<br>)<br>**Plaintiff,** )<br>)<br>**v.** )<br>)<br>**KILOLO KIJAKAZI, Acting**<br>**Commissioner of the Social Security**<br>**Administration,** )<br>)<br>**Defendant.** ) | Civil Action Number<br>**7:21-cv-00059-AKK** |

### MEMORANDUM OPINION

Barbara Smith seeks review of the decision of the Acting Commissioner of the Social Security Administration denying benefits. Doc. 1. Smith argues that the Administrative Law Judge erred by finding that Smith's vertigo was not severe, improperly evaluating her obesity and symptoms, and discounting the opinion of one of her oncologists. Doc. 13 at 8. Smith also challenges the ALJ's decision on separation-of-powers grounds. *Id.* at 8, 11–12. As explained, however, the ALJ's decision is due to be affirmed because the decision is supported by substantial evidence and the alleged constitutional infirmity does not require remand.

## I.

Smith, who previously worked as a kitchen manager, short-order cook, and store laborer, applied for disability benefits in March 2019 after being diagnosed with cancer and experiencing the effects of fatigue, weakness, vertigo, obesity,

hypertension, and diabetes.  *See* doc. 13 at 2; R. 19–21.  After the SSA denied her claims, Smith, her attorney, and a vocational expert appeared before an ALJ, who found that Smith was not disabled.  *See* R. 19; R. 27.  The Appeals Council denied review, R. 7, and the ALJ's decision thereafter became the final decision of the Acting Commissioner.  Smith subsequently filed this appeal.  Doc. 1.

## II.

On review, the court may decide only whether the record contains substantial evidence to support the ALJ's decision and the ALJ applied the correct legal principles.  42 U.S.C. § 405(g); *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020).  Courts review de novo the legal conclusions upon which the Commissioner's decision is based, while the Commissioner's factual findings are conclusive if supported by "substantial evidence."  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).  Substantial evidence refers to "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Id.*  This threshold "is not high," *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), and requires "less than a preponderance," *Moore*, 405 F.3d at 1211.  If substantial evidence supports these findings, the court must affirm, even if the evidence preponderates against them.  *Noble*, 963 F.3d at 1323.

When determining whether substantial evidence exists, the court cannot decide the facts anew, reweigh the evidence, or substitute its judgment for the

Commissioner's.  *Id.*; *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The court also cannot automatically affirm the decision.  *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).  Instead, the court "retain[s] an important duty to 'scrutinize the record as a whole' and determine whether the agency's decision was reasonable."  *Simon v. Comm'r of Soc. Sec.*, 7 F.4th 1094, 1104 (11th Cir. 2021) (quoting *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986)).

## III.

The Social Security Act "places a very heavy initial burden on the claimant to establish existence of a disability by proving that he is unable to perform his previous work."  *Bloodsworth*, 703 F.2d at 1240.  Indeed, "[t]his stringent burden has been characterized as bordering on the unrealistic."  *Id.* (collecting cases).  To qualify for benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. §§ 423(d)(1)(A); 416(i)(1).  An ALJ must determine:

(1) whether the claimant is currently unemployed;
(2) whether the claimant has a severe impairment;
(3) whether the impairment meets or equals one listed by the Commissioner;
(4) whether the claimant is unable to perform his or her past work; and
(5) whether the claimant is unable to perform any work in the national economy.

20 C.F.R. § 404.1520(a); *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'" *McDaniel*, 800 F.2d at 1030 (citing 20 C.F.R. § 416.920(a)-(f)).[1]

    For claims filed after March 27, 2017, the ALJ will not defer or give any specific weight to medical opinions or prior administrative medical findings.  20 C.F.R. § 404.1520c(a).  Rather, to determine the persuasiveness of a medical opinion or prior administrative finding in the record, the ALJ focuses on factors that include supportability,[2] consistency,[3] the medical source's relationship with the claimant,[4]

---

[1] If a claimant's impairments do not meet or equal a listed impairment, the ALJ determines the claimant's "residual functional capacity" based on "all of the relevant medical and other evidence" in the record.  20 C.F.R. § 404.1520(e).  *See also* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations.").

[2] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  *Id.* § 404.1520c(c)(1).

[3] "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* § 404.1520c(c)(2).

[4] This includes the length of the treatment relationship, the frequency of the examinations, the purpose of the treatment relationship, the extent of the treatment relationship (*e.g.*, the kinds of testing performed), and the examining relationship (*i.e.*, whether the medical source actually examined the claimant or only reviewed the claimant's file).  *Id.* § 404.1520c(c)(3).

and the medical source's specialization.[5]  *Id.* § 404.1520c(c).  The most important factors are supportability and consistency.  *Id.* § 404.1520c(a).

Further, when a claimant provides testimony concerning her or his subjective symptoms, the ALJ must determine whether there exists "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  If the record shows the claimant has a "medically determinable impairment that could reasonably be expected to produce her symptoms," the ALJ must assess the "intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work." *Costigan v. Comm'r of Soc. Sec.*, 603 F. App'x 783, 786 (11th Cir. 2015) (citing 20 C.F.R. § 404.1529(c)(1)). The ALJ must consider "all of the record," including objective medical evidence, the claimant's history, and statements by the claimant and the claimant's doctors, and the ALJ may consider factors like the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's

---

[5] "Specialization" refers to whether the medical source has received "advanced education and training to become a specialist," which may render that source's findings more persuasive.  *Id.* § 404.1520c(c)(4).  In addition, the ALJ may consider evidence showing that a medical source "has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements."  *Id.* § 404.1520c(c)(5).

symptoms; the type, dosage, effectiveness, and side effects of the claimant's medication; and treatments other than medication. *Id.*

Last, the ALJ must examine the claimant's testimony in relation to the other evidence, considering whether there are any "inconsistencies or conflicts between those statements and the record." *Id.* If the ALJ subsequently discredits the claimant's testimony, the ALJ must "articulate explicit and adequate reasons for doing so," and the failure to articulate the reasons for discrediting this testimony "requires, as a matter of law, that the testimony be accepted as true." *Wilson*, 284 F.3d at 1225 (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). Taken together, the court "will not disturb a clearly articulated credibility finding supported by substantial evidence." *Mitchell*, 771 F.3d at 782 (internal citations omitted).

## IV.

In this case, at Step One, the ALJ determined that Smith had not engaged in substantial gainful activity since her alleged onset date in July 2018. R. 21. At Step Two, the ALJ found that Smith had the following severe impairments: status post malignant neoplasm of breast, status post lumpectomy, type II diabetes mellitus, and hypertension. *Id.* The ALJ determined that Smith's obesity, hyperlipidemia, and chronic kidney disease were well-controlled, non-symptomatic, or of less than a 12-month duration and were thus nonsevere. R. 21–22. Nevertheless, the ALJ stated

that she considered "all of [Smith's] allegations in context with the established severe impairments" to make her findings.  R. 22.

At Step Three, the ALJ found that Smith's impairments, singly and in combination, did not meet or medically equal a listed impairment.  *Id.*  The ALJ referred to Smith's obesity and the relevant regulation, SSR 19-2p, and explained that "the signs, symptoms and laboratory findings of [Smith's] obesity [were] not of such severity as found in any listing."  *Id.*  The ALJ stated that she "considered any functional limitations in [Smith's] ability to do basic work activities resulting from obesity, alone and in combination with [her] other impairments" in accordance with SSR 19-2p.  *See id.*

The ALJ then turned to evidence in the record, including Smith's testimony, medical exams, and doctors' opinions, to assess Smith's residual functional capacity. In Smith's self-reports, she asserted that breast cancer, diabetes, and vertigo prevented her from working.  R. 159.  Smith noted that she sometimes had issues bathing, feeding herself, and using the toilet.  R. 176–77.  She wrote that she prepared her own meals but became tired quickly and that she attended church weekly but could not go out alone because she got dizzy.  R. 178–80.  Smith noted that she could walk for up to 30 minutes before needing to stop and rest for 15 minutes, *id.*, and at her hearing, she testified that she could lift up to 20 pounds, R.

43. She also testified that she had issues with bending and stooping due to her cancer and the related chemotherapy, radiation, and fatigue. *Id.*

The ALJ cited this evidence and then compared it to the medical evidence in Smith's record, *see* R. 23–24, which the court summarizes. In 2018, Smith visited oncologists Dr. Frederick Schnell and Dr. Ashvini Sengar at Cancer Care Center of Tuscaloosa, where a mammogram revealed a "[l]eft breast abnormality" and a biopsy showed a "tumor to be ER/PR strongly positive." R. 223. She received a lumpectomy and then chemotherapy through December 2018. *See id.*; R. 239. Following chemotherapy, Smith received radiation therapy. R. 226.

She also visited The Radiology Clinic, LLC, where Dr. Sengar gave her whole-body bone and CT scans and noted "[m]ild hepatic steatosis," "three simple appearing cysts at the left kidney," and "a few small hypodensities at the right kidney which [were] most suggestive of small cysts." R. 276. Radiation therapy concluded in January 2019. R. 231. Around this time, Dr. Sengar wrote: "Due to severe weakness and fatigue will arrange for long term disabilities for 6 months. Follow up in 2 months." R. 237.

The ALJ did not cite specific parts of Smith's vertigo-related records but summarized that around this time "[Smith] had recently developed vertigo and was undergoing physical therapy and it was improving." R. 24. Relevant records reveal the following. In February 2019, Smith visited Dr. Gary Lake due to dizziness,

unsteadiness, and vertigo.  R. 296.  Smith said that her dizziness began after her surgery in 2018, with ear fullness or pressure and ringing, nausea and vomiting, headaches, and blurred vision.  *Id.*  Smith reported spinning or moving sensations lasting all day and noted that episodes often occurred several times a day.  *Id.* Dr. Lake determined that Smith "warrant[ed] the medical necessity for diagnostic function vestibular tests to support the need for balance and vestibular physical therapy services" and added Meclizine to Smith's medications.  R. 298–99.

Smith then received "serial testing" to assess her vestibular dysfunction.  R. 302.  Based on her "balance deficit" and "imbalance and dizziness symptoms on all irregular and/or compliant surfaces," she was recommended physical therapy.  *Id.* Smith otherwise had normal reaction times, weight symmetry, amplitude scaling, sway energy, and adaptation function.  *Id.*

Smith then began physical therapy and testing at Fyzical Therapy & Balance Centers.  *See* R. 310.  After reviewing Smith's history and "the objective findings from the computerized, functional, and bedside testing," Dr. Lake and physical therapist Dr. Toshio Leeper noted that "the results support[ed] benign paroxysmal positional vertigo with visual vestibular dysfunction pattern."  R. 312.  They reported that Smith "demonstrate[d] both gaze and postural instability" but that her rehabilitation prognosis was "[e]xcellent."  *Id.*  In March 2019, Smith reported walking very short distances with less assistance and "feeling less dizzy since

9

coming to PT," although the dizziness "ha[d] not been completely eliminated." R. 315. She displayed "significant improvement on objective measures of balance" and "[was] encouraged by progress to date and need[ed] to continue therapy to achieve [her] balance goals." R. 316.

The ALJ summarized Smith's cancer- and hypertension-related follow-ups, R. 24, which indicate the following. In April 2019, Dr. Sengar noted that Smith was taking "adjuvant letrozole" without side effects, had vertigo but was improving with therapy, and had started a new diabetes medication. R. 322. Throughout 2019, Smith visited Whatley Health Services for diabetes-, hypertension-, and obesity-related symptoms. *See* R. 24; R. 375. In September 2019, Smith's records showed that she had "Type 2 diabetes mellitus without complications"; her "A1C [was] slightly improved"; and she had dizziness, possibly related to her medication, that the doctor would assess "if symptoms persist[ed]." *Id.* In late 2019 and early 2020, her records reported flu-like symptoms and hypertension, R. 380, but not vertigo or dizziness, *see* R. 419 (reporting Smith's fatigue and shortness of breath but that she denied dizziness and headaches); R. 428 (reporting similar).

In early 2020, Smith visited cardiologist Dr. Anand Pandey, who noted no structural cardiac abnormalities or valvular abnormalities of significance. R. 391. An "exercise stress test . . . was negative for ischemia at a low workload." *Id.* Dr. Pandey encouraged Smith "to follow a heart healthy lifestyle" and "asked her to

have her lipid profile and blood sugar checked through her primary physician." *Id.* *See also* R. 24 (summarizing this visit).

The ALJ then turned to the return-to-work documents Dr. Sengar apparently completed in late 2018. *See* R. 25 (citing R. 441). Dr. Sengar wrote that Smith became incapacitated in late August 2018 due to cancer and that she was receiving chemotherapy treatment. R. 441. Dr. Sengar also wrote that Smith had nausea, fatigue, and weakness and that her return-to-work date was "to be determined – possibly 6 month[s]." R. 441–42. Dr. Sengar completed another form in December 2018 that said Smith should not bend, climb, or pull; engage in prolonged twisting movements; or sit, stand, or lift for prolonged periods of time. R. 25; R. 437. Dr. Sengar wrote that Smith's expected return date would "be determined after radiation treatment completed/recovery." R. 437.

Finally, the ALJ cited the assessment of Dr. Gloria Sellman, a state-agency physician who reviewed Smith's records in May 2019. R. 25. Dr. Sellman opined that Smith could perform less than a full range of medium-exertion work and that Smith could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. *Id.*; R. 66–67. Dr. Sellman also wrote that Smith should avoid hazardous machinery, heights, commercial driving, and open bodies of water. *Id.*

The ALJ determined that Smith's statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with the record evidence. R.

23–24.  In making this determination, the ALJ found that Dr. Sengar's opinions as to Smith's ability to return to work were "not persuasive for long term disability" because they were made "in close proximity to [Smith's] initial breast cancer diagnosis."  R. 25.  The ALJ also noted that the evidence showed Smith's conditions improved.  *Id.*  The ALJ found Dr. Sellman's opinion only "somewhat persuasive" because it did not reflect additional evidence provided at the hearing.  *See id.*  The ALJ concluded that Smith's "symptoms ha[d] been well controlled with conservative treatment with surgery, prescription medications, and physical therapy," so her conditions were "not as severe or limiting as alleged."  R. 25–26.

In addition, the ALJ determined that Smith's statements about her impairments and ability to work "[were] not entirely supported" given "the degree of medical treatment required, discrepancies between [her] assertions and information contained in the documentary reports, the medical history, the findings made on examination, and the reports of the reviewing, treating and examining physicians."  R. 26.  The ALJ reasoned that while the evidence indicated some functional limitations, these findings, including Smith's treatment history, "[were] not indicative of any intractable condition that would preclude [Smith] from performing a reduced range of medium work for twelve consecutive months."  *Id.*

Thus, the ALJ found the following residual functional capacity:

[Smith could] perform medium work . . . except [she] could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. [She

could] [n]ever climb ropes, ladders or scaffolds. [Smith] could tolerate
no exposure to unprotected heights or dangerous machinery. [She]
would require ready access to the restroom.

R. 23.  At Step Four, the ALJ found that Smith could perform her past work as a

store laborer, short-order cook, or kitchen manager.  R. 26.  At Step Five, the ALJ

concluded that Smith was not disabled.  R. 27.

**V.**

Smith challenges the ALJ's decision on three substantive grounds: that the

ALJ should have deemed Smith's vertigo severe, did not properly evaluate her

symptoms or obesity, and should have given more weight to Dr. Sengar's opinion.

Doc. 13 at 8.  In addition, Smith argues that the SSA Commissioner's for-cause

removal protection, *see* 42 U.S.C. § 902(a)(3), violates separation-of-powers

principles and requires remand of her case.  Doc. 13 at 8.  The court addresses

Smith's substantive challenges before turning to her constitutional argument.

**A.**

Smith claims that the ALJ erred by finding her vertigo nonsevere.  Doc. 13 at

8, 12.  At Step Two, the ALJ considers the "medical severity" of the claimant's

impairments.  *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1264–65 (11th Cir.

2019) (citing 20 C.F.R. § 404.1520(a)(4)(ii)).  "An impairment . . . is not severe if it

does not significantly limit [the claimant's] physical or mental ability to do basic

13

work activities." *Id.* at 1265.  The claimant retains the "mild" burden to show an impairment's severity.[6] *Id.*

Smith says that "[d]espite objective evidence establishing vertigo/vestibular dysfunction as a severe impairment, the ALJ fail[ed] to address it in her decision other than noting that Ms. Smith, 'stated her vertigo was related to her hypertension.'"  Doc. 13 at 12.  However, the ALJ mentioned Smith's vertigo, dizziness symptoms, physical therapy, and improvement.  *See* R. 23–24.  And although the record does document Smith's dizziness as it pertained to her vertigo, it also documents her improvement with physical therapy in 2019 and 2020.  Thus, Smith may not have met her burden to establish the severity of her vertigo.

Regardless, the "finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe," satisfies Step Two. *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987).  As a result, "[a]ny error" at Step Two must have been "harmless because the ALJ found in [Smith's] favor as to

---

[6] Two cases are illustrative on this point.  In *Schink*, the Circuit held that, given the claimant's years-long history of mental-health issues corroborated by functioning scores and doctors' reports, substantial evidence did not support the ALJ's nonsevere impairment finding.  *See id.* at 1265–66.  By contrast, in *Davis v. Barnhart*, the Circuit held that substantial evidence supported the ALJ's finding that the claimant's depression was not severe.  186 F. App'x 965, 967 (11th Cir. 2006).  There, the Circuit cited a doctor's opinion that "[the claimant's] diagnosis was a 'toss up' between no diagnosis and adjustment disorder" and her impairments "were not grave," the ALJ's decision to give "little weight" to another doctor's opinion because that doctor noted that the claimant overstated her symptoms, and the ALJ's decision to discount a third doctor's "self-contradictory" opinion.  *See id.*  The Circuit emphasized that "[t]he ALJ articulated his reasons for discrediting the other evaluating doctors' opinions, which [was] supported by the record."  *Id.*

impairment" by determining that she experienced severe impairments, like hypertension, and proceeding to Step Three to evaluate all of her limitations.  *See Hearn v. Comm'r, Soc. Sec. Admin.*, 619 F. App'x 892, 895 (11th Cir. 2015); *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014).[7] *See also* R. 21–22 ("[T]he undersigned considered all [of Smith's] allegations in context with the established severe impairments in reaching the appropriate findings in this decision.").  Unfortunately, this argument is unavailing.

## B.

Smith next contends that the ALJ erred in her evaluation of Smith's symptoms and obesity.  Doc. 13 at 14.  The court parses this contention in two parts.

### 1.

First, Smith claims that the ALJ used "plainly circular reasoning" to find that Smith's statements about her symptoms were "inconsistent because . . . [her] capabilities [were] reflected accurately in the residual functional capacity."  *Id.* at 14 (quoting R. 23–24).  In other words, Smith claims that "the ALJ found [her] statements inconsistent because the ALJ's own RFC gave her appropriate limitations," which "does not suffice as genuine evaluation."  *Id.*

---

[7] "[T]he regulations state that the only consequence of the analysis at [S]tep [T]wo is that, if the ALJ finds no severe impairment or impairments, he should reach a conclusion of no disability. . . . [I]t is apparent that there is no need for an ALJ to identify every severe impairment at [S]tep [T]wo." *Tuggerson-Brown*, 572 F. App'x at 951 (citing 20 C.F.R. § 404.1520(a)(4)(ii)).

When provided with testimony concerning subjective symptoms, the ALJ must determine whether there exists "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson*, 284 F.3d at 1225. If the record shows the claimant has a "medically determinable impairment that could reasonably be expected to produce her symptoms," the ALJ assesses the "intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work" using evidence like the claimant's history and medical opinions, daily activities, medication, and other treatments in the record. *Costigan*, 603 F. App'x at 786.

Here, the ALJ found that Smith's medically determinable impairments could reasonably be expected to cause her alleged symptoms but that the record did not fully substantiate their intensity, persistence, and limiting effects. R. 23. After reviewing Smith's medical history, the ALJ explained that "the evidence of record show[ed] that [Smith's] symptoms ha[d] been well controlled with conservative treatment with surgery, prescription medications, and physical therapy" and that she had "no significant mental impairments." R. 25. The ALJ continued:

> [Smith's] statements concerning her impairments and their impact on her ability to work are not entirely supported in light of the degree of medical treatment required, discrepancies between [her] assertions and information contained in the documentary reports, the medical history,

16

the findings made on examination, and the reports of the reviewing, treating and examining physicians.

R. 26.  The ALJ determined Smith's residual functional capacity while accounting for "some abnormalities" and adding "limitations [that] would significantly reduce the impact of her impairments and allow her to engage in some work activities."  R. 24; R. 26.  Moreover, the ALJ noted that the residual functional capacity "would not likely aggravate or exacerbate [Smith's] symptoms."  R. 24.

Accordingly, the ALJ clearly explained her reasons for discounting at least some of Smith's testimony by explicitly reviewing Smith's medical history and records to ascertain the extent of her symptoms.  Because substantial evidence in Smith's record supports the ALJ's decision, the court cannot disturb the ALJ's clearly articulated finding on this point.  *See Mitchell*, 771 F.3d at 782.

2.

Smith also argues that the ALJ did not properly evaluate her obesity under SSR 19-2p.  Doc. 13 at 14–15.  Under SSR 19-2p, the ALJ must "consider evidence from all sources" and assess the claimant's residual functional capacity to "show the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment."[8]  According to Smith, the ALJ did not perform a "genuine evaluation regarding the effects of [her] obesity on

---

[8] SSR 19-2p: Titles II and XVI: Evaluating Cases Involving Obesity, Social Security Rulings, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2019-02-di-01.html (last visited Mar. 23, 2022).

other impairments or her exertional limitations" and should have better accounted for Smith's obesity-related fatigue by adding limitations as to concentration, persistence, or pace to her residual functional capacity. *Id.* at 16.

However, the ALJ noted that she had previously found Smith's obesity severe but that the signs, symptoms, and laboratory findings "[were] not of such severity as found in any listing." R. 22. The ALJ quoted SSR 19-2p at length and noted that Smith's body mass index fell within the listed range. *See id.* And the ALJ mentioned fatigue and other possibly obesity-related symptoms while recounting Smith's medical history. *See* R. 24. While Smith did testify about her fatigue, the ALJ could properly decide whether Smith's testimony was consistent with the other evidence, *see supra* § V.B.1, and determine Smith's residual functional capacity while accounting for obesity-related symptoms as required.

## C.

Additionally, Smith argues that the ALJ erroneously discounted Dr. Sengar's opinion. Doc. 13 at 16. For claims filed after March 2017, like Smith's, the ALJ will not give specific or controlling weight to prior medical opinions; rather, the ALJ considers the opinion's supportability and consistency to determine its persuasiveness. 20 C.F.R. §§ 404.1520c(a)-(c). Here, the ALJ concluded that "the opinions of . . . Dr. Sengar, [were] not . . . persuasive for long term disability" because Dr. Sengar's reports "were completed in close proximity to [Smith's] initial

breast cancer diagnosis" and because "the medical evidence show[ed] [her] conditions . . . improved." R. 25. The ALJ reasoned that disability was "a question reserved for Commissioner," that the forms did not indicate the methods or standards Dr. Sengar used, and that Dr. Sengar "did not have the benefit of the additional evidence provided at the hearing level, including additional medical records." *See id.* Because the ALJ explained why she did not find Dr. Sengar's opinions persuasive by referring to Smith's record of improvement and to Dr. Sengar's lack of certain standards and evidence, the court cannot disturb this finding, either.

## D.

The court turns to Smith's final contention of error: her constitutional argument. Smith and the SSA in fact agree that 42 U.S.C. § 902 unconstitutionally limits the President's authority to remove the SSA Commissioner by requiring the President to have good cause.[9] Docs. 13 at 8; 16 at 6. For her part, Smith argues that this infirmity requires a new hearing before a different ALJ because the ALJ and Appeals Council in her case derived "constitutionally defective" authority from then-Commissioner Andrew Saul. Doc. 13 at 9, 11. Citing a litany of factors, the SSA responds that Smith has not shown that the removal provision caused her the harm required to warrant remand. Doc. 16 at 6–7.

---

[9] In relevant part, § 902 provides that the Commissioner "may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." 42 U.S.C. § 902(a)(3).

The court assumes without deciding § 902(a)(3)'s constitutional defect.  Still, an unconstitutional removal provision is "severable from the other statutory provisions bearing on [an agency's] authority," so "[t]he agency may therefore continue to operate."  *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2192 (2020) (discussing the CFPB director's removal protection); *Jordan v. Comm'r of Soc. Sec. Admin.*, No. CV-21-08022-PCT-DGC, 2022 WL 842902, at *2 (D. Ariz. Mar. 22, 2022) (applying *Seila Law* to § 902(a)(3)).  Indeed, in the context of the Federal Housing Finance Agency, the Supreme Court recently observed that the unlawfulness of a removal provision "[did] not strip the Director of the power to undertake the other responsibilities of his office."  *Collins v. Yellen*, 141 S. Ct. 1761, 1788 n.23 (2021).  This "[s]ettled precedent" illustrates that then-Commissioner Saul's purportedly unconstitutional removal protection did not automatically pollute the authority vested thereto, *see id.*, and undermines Smith's argument that "[t]he ALJ's delegation of authority in this case came from Mr. Saul and is therefore constitutionally defective," doc. 13 at 9.

Yet, an unconstitutional removal provision can still inflict harm under certain circumstances—for example, where the President "ma[kes] a public statement expressing displeasure with actions taken by [an officer] and ha[s] asserted that he would remove the [officer] if the statute did not stand in the way."  *Collins*, 141 S. Ct. at 1789.  *See also id.* at 1801 (Kagan, J., concurring) ("[P]laintiffs alleging a

removal violation are entitled to injunctive relief—a rewinding of agency action—only when the President's inability to fire an agency head affected the complained-of decision."). Smith claims that Commissioner Saul lacked the authority to issue the regulations the ALJ and Appeals Council applied and adds that President Biden "unmistakably" wished to terminate Commissioner Saul upon taking office and that "the policy adjudication framework and processes established by Mr. Saul [were] the primary and lead reason for President Biden's dissatisfaction" and Commissioner Saul's termination. Docs. 13 at 10; 17 at 23–24. Smith thus argues that President Biden only refrained from replacing Commissioner Saul due to § 902(a)(3), that Commissioner Saul's decisions negatively affected her claim, and that § 902(a)(3) therefore caused her harm. *See id.* at 24–25.

This argument suffers from fatal flaws. First, Smith's claim that Commissioner Saul's extended tenure affected her disability determination is conclusory. She does not supply evidence that Commissioner Saul or President Biden played a role in her claim, even if President Biden's regulatory philosophy or policy goals indeed stood at odds with those of the Commissioner he removed. *See Jordan*, 2022 WL 842902, at *2; *Vergara v. Kijakazi*, No. 20-22964-Civ-WILLIAMS/TORRES, 2022 WL 769704, at *8 (S.D. Fla. Feb. 23, 2022). Further, when the SSA adjudicated her claim in 2019 and the ALJ and Appeals Council issued their decisions in 2020, doc. 13 at 2, President Trump held office. Smith does

not argue that President Trump, who nominated Commissioner Saul, would have removed him but for § 902(a)(3).[10]   Finally, the court "doubt[s] the mass of SSA decisions—which would not concern the President at all—would need to be undone" due to the removal provision, *Collins*, 141 S. Ct. at 1802 (Kagan, J., concurring), as Smith essentially suggests.  Altogether, Smith fails to demonstrate that § 902(a)(3)'s removal protection, even if unconstitutional, requires a do-over in her case.[11]

## VI.

In conclusion, the court will affirm the ALJ's decision because it is supported by substantial evidence and the constitutional infirmity, if any, does not warrant remand.  A separate order follows.

**DONE** the 8th day of April, 2022.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE

---

[10] *See also Collins*, 141 S. Ct. at 1801–02 (Kagan, J., concurring) ("As the majority explains, its holding ensures that actions the President supports—which would have gone forward whatever his removal power—will remain in place.").

[11] The SSA also asserts that the ALJ who adjudicated Smith's claim was appointed by Acting Commissioner Nancy Berryhill, "whom the President could have removed . . . at will, at any time." Doc. 16 at 7, 9.  Indeed, "[b]ecause former Acting Commissioner Berryhill was not subject to 42 U.S.C. § 902(a)(3)'s tenure protection, any argument that a nexus exists between § 902(a)(3) and a compensable harm to [Smith] is further strained."  *See Tibbetts v. Comm'r of Soc. Sec.*, No. 2:20-cv-872-SPC-MRM, 2021 WL 6297530, at *6 (M.D. Fla. Dec. 21, 2021).